UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **DANIEL ANDRADE, SR.** and **ELIZABETH M. ANDRADE,** individually and as the representative of a class of similarly-situated persons, §§§§§ | |
| Plaintiffs, § | |
| § | |
| v. § | |
| § | Civil Action No. 1:18-CV-00019 |
| **COMPASS BANK D/B/A BBVA COMPASS,** §§ | |
| § | |
| Defendant. § | |

**COMPASS BANK D/B/A BBVA COMPASS'S MOTION TO DISMISS**

**I.   ARGUMENT SUMMARY**

The Andrades' claims premise on a fundamental misinterpretation of their contractual agreement with Compass Bank d/b/a BBVA Compass (**Compass**) and a flawed reading of the Truth in Lending Act's, 15 U.S.C. § 1601 *et seq.*, (**TILA**) notice requirements. The Andrades contend Compass improperly charged default interest because the credit agreement only permitted Compass to charge default interest after (**1**) acceleration of the loan and (**2**) prior notice. But the credit agreement expressly permits Compass to charge default interest after a payment default—regardless of any acceleration or prior notice. Compass complied with the provisions of the Andrades' credit agreement. The Andrades admit that they did not comply. The Andrades, not Compass, are the source of the issues about which they now complain.

The Andrades' TILA claim fails because the Andrades have either misread or misunderstand TILA's notice requirements. As the Supreme Court made clear in *Chase Bank USA, N.A. v. McCoy,* 562 U.S. 195, 210 (2011), TILA's change-in-terms notice requirements do not apply "'if the creditor specifies in advance the circumstances under which an increase will

occur.'"  *Id.* (quoting Regulation Z, 69 Fed. Reg. 70925, 70931, proposed.)  When, as the Andrades allege here, a creditor merely imposes a contractually specified default interest rate, it is not changing the terms of a credit agreement—it is implementing a pre-existing term.  TILA does not require a change-in-terms notice when a credit implements a pre-existing term.  Consequently, the Andrades' TILA claim fails as a matter of law.

The Andrades' remaining claims are similarly deficient.  The economic loss rule bars their negligent misrepresentation claim because it is based entirely on allegations of mortgage servicing errors that are contractual in nature.  The Andrades' Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*, (**RESPA**) claim fails because RESPA's error resolution provisions **do not apply to home equity lines of credit**.  Even if they did apply, the Andrades cannot identify any damages stemming from Compass's alleged actions.  Accordingly, all of the Andrades' claims fail as a matter of law and should be dismissed.

## II.  BACKGROUND FACTS

### A.  Credit agreement.

The Andrades entered into a home equity line of credit in January 2008, requiring monthly payments equal to the greater of their accrued finance charges or $75.00. (Am. compl., at 3 ¶¶ 11-14; Doc. 18-1, at 2.)  To calculate the monthly finance charge, Compass determines the periodic rate and multiplies it by the billing cycle's average daily balance. (Doc. 18-1, at 3.)  If the Andrades do not meet the agreement's repayment terms, Compass can increase the annual percentage rate to 18% (or a 1.5% monthly periodic rate) (**default interest**).  (*Id.*, at 6.)

The agreement requires the Andrades pay more than the regular monthly finance charge if they do not comply with the agreement terms. The Andrades must pay past due amounts with their monthly payment.[1] (*Id.*, at 2.)

**B.     The Andrades' default triggered the contractual interest rate increase.**

The Andrades allege they diligently made their monthly payments under the credit agreement until December 2016 when they admittedly failed to make the minimum payment of $296.51 due December 12, 2016. (Am. compl., at 4-6 ¶¶ 21-30.) They also acknowledge they failed to fully pay the following month's installment payment due on or before January 9, 2017; having remitted a payment of only $296.51 on January 12, 2017. (*Id.*, at 6 ¶¶ 31, 33.) The Andrades suggest this was the amount the monthly statement required to be paid (albeit by January 9, 2017), but the statement they reference contradicts their allegation. That statement shows they needed to pay $593.02 by January 9, 2017, representing both the current month's minimum payment and prior month's missed payment. The Andrades' alleged $296.51 payment on January 12, 2017, was not only admittedly late, but also insufficient to bring the account current. The Andrades repeatedly reference the monthly statements but fail to attach them. Compass attaches them as composite exhibit 1. This court may consider the statements on a motion to dismiss as they form the basis of the Andrades' claims. *See Taylor v. Shreveport*, 798 F.3d 276, 279, n.4 (5th Cir. 2015).

When the Andrades failed to make the payments due by December 12, 2016 and January 9, 2017, Compass's next statement increased the annual periodic rate to 18%. (Ex. 1.) It called

---

[1] Under the "Minimum Payment" paragraph, the agreement states the Andrades "minimum payment" is the regular payment (i.e. the accrued finance charges or $75.00, whichever is greater), plus any amounts past due and all other charges. (Doc. 18-1, at 2.) *See also* paragraph entitled "Credit Limit."

for a $2,117.93 payment: (**1**) $593.02 for the two prior months' missed payments and (**2**) $1,524.91 for the current month's minimum payment calculated at an 18% annual interest rate.[2]

The Andrades claim subsequent, improper interest charges and failures by Compass to credit payments properly. (Am. compl., at 7-9 ¶¶ 39, 47-49, 52.)  These allegations contradict the monthly statements.  They show Compass consistently imposed 18% default interest only when the Andrades were two months delinquent in their monthly payment obligations, and Compass fully accounted for all payments the Andrades allegedly made.  A chart summarizing the information from the statements is attached as exhibit 2.  The Andrades' complaints stem from their refusal to recognize Compass's contractual right to charge default interest, and their decision to ignore the monthly statements and intentionally pay amounts clearly insufficient to meet their obligations under the credit agreement.

C. **Andrades' QWR.**

The Andrades allege Compass failed to timely acknowledge a QWR they sent Compass on November 28, 2017—the day after Compass filed its foreclosure action.  (*Id.* ¶¶ 55-58.)  The Andrades contend they incurred damages of lost time and postage in sending the QWR. (*Id.* ¶ 65.)

D. **Andrades' causes of action.**

The Andrades assert some class claims and others solely on behalf of themselves. Their breach of contract claim (Count I) confusingly purports to be brought on behalf of a class, but asserts several distinct contract breaches not falling within the defined class that appear to be asserted solely on the Andrades' behalf.[3]  Specifically, the Andrades claim Compass breached the credit agreement by (**1**) failing to credit their payments on the date received, (**2**) charging default

---

[2] The statement does not reference a credit for the untimely and insufficient payment of $296.51 the Andrades claim to have paid on January 12.  Compass credited that payment on January 17, after the statement issued.  (Ex. 1.)

[3] These claims base on inherently individualized issues that could not be brought on behalf of a class, such as allegations Compass failed to timely credit one of their payments, failed to refund an overpayment, or made certain representations to them by phone.  *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602-03 (5th Cir. 2006).

interest prior to the Andrades' default, (**3**) refusing to return an alleged overpayment, (**4**) charging default interest without authorization, and (**5**) charging default interest prior to termination and acceleration of the loan. (Am. compl., at 11-12 ¶¶ 67-77.)  But, their defined class only includes the last of these alleged breaches—similarly situated persons charged default interest prior to termination and acceleration of their loan. (*Id.*, at 12 ¶¶ 71, 79.)  Their other class claim (Count II) alleges Compass violated TILA when it (**1**) misrepresented the Andrades could be charged a higher default interest rate without prior notice, (**2**) charged a higher interest rate/minimum payment without prior notice, and (**3**) adversely changed the credit agreement after origination and without consent. (*Id.*, at 17-18 ¶¶ 94, 100-03.)

The Andrades also assert a negligent misrepresentation claim based on their allegations Compass provided false information regarding application of their April payment and imposition of default interest.  They further claim that Compass violated RESPA when it did not timely acknowledge or respond to their QWR. (*Id.*, at 23-25 ¶¶ 117-21, 127-32.)

### III.   LEGAL STANDARD

Rule 12(b)(6) authorizes the dismissal of a complaint that fails "to state a claim upon which relief can be granted."  To decide a motion to dismiss, a court accepts all well-pleaded facts as true and views them in the light most favorable to the claimant. *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008).  "Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002).  A formulaic recitation of the elements, because of its conclusory nature, is not entitled to the usual presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 698 (2009).  A plaintiff must plead facts that " raise a right to relief above the speculative level." *Bell Atl. v. Twombly,* 550 U.S. 544, 555-56 (2007).  The facts actually

pleaded must give rise to a plausible claim for relief. *Iqbal*, 556 U.S. at 678. A complaint must offer more than an "unadorned, the-defendant unlawfully-harmed-me accusation." *Id.*

This court can consider the Andrades' allegations and any documents they incorporate into the pleadings and all matters of which it may take judicial notice. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996). A plaintiff incorporates documents into the pleadings if they refer to them in their complaint and they are central to their claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–90 (5th Cir. 2000). A defendant may attach the documents plaintiffs incorporate into their complaint with its motion to dismiss. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). "Where such extrinsic documents conflict with the allegations, the extrinsic documents control." *Priester v. Long Beach Mortg. Co.*, No. 4:16-cv-00449, 2017 WL 3671378, at *3 (E.D. Tex. Feb. 3, 2017).

### IV.   THE ANDRADES' CLASS CLAIMS FAIL

**A.   The contractual language defeats the Andrades' class breach of contract claim.**

The breach of contract claim the Andrades seek to bring on behalf of a putative class bases on a tortured, unsustainable interpretation of their credit agreement. They contend Compass breached the agreement by charging default interest of 18% without first terminating and accelerating their loan. (Am. compl., at 4, 11 ¶¶ 18-19, 71, 79.) Their claim contradicts the contract's plain language, which this court may construe as a matter of law on a motion to dismiss.[4]

Although not clearly pleaded, the Andrades appear to base their argument on the provisions in the "Lender's Rights" section of the credit agreement entitled "Termination and Acceleration" and "Rate Increases." (*See id.*) The first provision grants Compass the option to terminate and accelerate the credit agreement upon the occurrence of certain events, including,

---

[4] A court can rely on contract interpretation principles to dismiss a breach of contract claim pursuant to Rule 12(b)(6) because contract interpretation is a question of law for the court to decide. *Bruce Foods Corp. v. Tex. Gas Serv.*, No. EP-13-cv-231, 2014 WL 652312, at *16 (W.D. Tex. Feb. 19, 2014).

among other things, a failure to "meet the repayment terms of this credit agreement." (Doc. 18-1, at 4 ¶ Lenders Rights: Termination and Acceleration.)  The "Rate Increases" provision grants Compass the optional right to increase the interest rate to 18% after termination and acceleration has occurred.  It provides:

> **Rate Increases.**  In addition to our rights during termination and acceleration, we may increase the variable ANNUAL PERCENTAGE RATE under the Agreement to 18.000 percent per annum . . . If we do not increase the ANNUAL PERCENTAGE RATE upon termination or acceleration of your Credit Line Account, it will continue at the variable rate in effect as of the date of termination or acceleration of your loan.

This provision is not the **exclusive** basis to support an 18% interest rate—it merely provides one circumstance in which Compass may impose the 18% interest rate.

The Andrades ignore the "Rate Increases Upon Default" provision on page 5, which grants Compass the right to charge 18% default interest regardless of whether Compass has exercised its optional right to terminate and accelerate. It states:

> **Rate Increases Upon Default.**  Notwithstanding any provision of this Agreement to the contrary, if you do not meet the repayment terms of this Credit Agreement, we may increase the ANNUAL PERCENTAGE RATE under this agreement to eighteen (18%).  In no event will the ANNUAL PERCENTAGE RATE exceed the maximum rate permitted by applicable law.

(*Id.*, at 6 ¶ Rate Increases Upon Default.)  The right to impose 18% default interest under this provision depends solely on payment default (not termination or acceleration) and unequivocally grants Compass that right "notwithstanding any provision of this Agreement to the contrary."

The Andrades' claim Compass can only increase the interest rate up to 18% after termination and acceleration is simply contrary to the plain language of the credit agreement and settled contract interpretation principles.  In interpreting contracts, courts must give effect to the parties' intent as reflected in the contract and must enforce unambiguous language as written. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009); *Don's Bldg. Supply,*

*Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008).  The court must "examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless."  *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999).  The "Rate Increases Upon Default" provision gives Compass the unconditional right to charge 18% default interest upon a payment default without any requirement it first terminate and accelerate.  It easily harmonizes with the provision permitting 18% interest upon acceleration, which provides another instance where 18% interest is authorized.  Even if there were an inconsistency between these provisions, the "Rate Increases Upon Default" provision takes precedence—"notwithstanding any provision of this Agreement to the contrary."  (Doc. 18-1, at 6.)  The Andrades' proposed interpretation looks at provisions in isolation and out of context, fails to consider the agreement as a whole, and fails to "afford[] some consequence to each part of the instrument so that none of the provisions will be rendered meaningless."  *See ExxonMobil Corp. v. Elec. Reliability Servs. Inc.*, 868 F.3d 408, 415 (5th Cir. 2017).

**B.     The Andrades' TILA violation claim is meritless.**

The Andrades contend 12 C.F.R. § 226.9(c)(1)(i)[5] required Compass to provide notice before it increased the minimum payment and interest rate.  (Am. compl., at 16-18 ¶¶ 90-103.)  Section 226.9 outlines the notice requirements a creditor must provide if a creditor changes certain terms of a home equity line of credit (**HELOC**).  12 C.F.R. § 226.9(c).  The Andrades maintain imposing the 18% contractual default rate represents a change in terms within the ambit of 12 C.F.R. § 226.9(c)(1).

---

[5] The Andrades state Compass violated 12 C.F.R. § 226.5(c). (Am. compl., at 18 ¶¶ 100-03.)  This section states "Disclosures shall reflect the terms of the legal obligation between the parties.  If any information necessary for accurate disclosures is unknown to the creditor, it shall make the disclosure based on the best information reasonably available and shall state clearly that the disclosure is an estimate."  Compass assumes the reference to § 226.5 was in error and construes the Andrades as asserting claims for violating § 226.9(c) as they refer to this regulation in their count and because it implicates the actions of which the Andrades complain.  (*See id.*; 12 C.F.R. §§ 226.6(c), 226.9(c).)

The Supreme Court rejected this argument in *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011). It held the 2008 version of the same regulation "did not require [the bank] to provide [the borrower] with a change-in-terms notice before it implemented the [a]greement term allowing it to raise his interest rate following delinquency or default." *Id.*, at 214-15. The Supreme Court gave deference to the Federal Reserve Board's interpretation in its *amicus* brief that notice was not required because an interest rate increase pursuant to a contractual agreement is not a "'change in terms,' but rather the implementation of terms already set forth in the initial disclosure statement." *Id.*, at 208-09 (citing Br. for United States, at 10-11, *id.*)[6].

Although *McCoy* involved credit card issuers rather than secured open end credit (e.g., HELOCs), the distinction is irrelevant because the 2008 regulation *McCoy* interpreted applied to both secured and unsecured open end credit agreements. 12 C.F.R. § 226.9(c)(1) (2008). It stated:

> "**Change in terms**--(1) *Written notice required.* Whenever any term required to be disclosed under § 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice shall be mailed or delivered at least 15 days prior to the effective date of the change. The 15-day timing requirement does not apply if the change has been agreed to by the customer, or if a periodic rate or other finance charge is increased because of the consumer's delinquency or default; the notice shall be given, however, before the effective date of the change.

*See id.* The current version of the regulation, which now applies only to home equity loans, is materially the same as the version *McCoy* interpreted. It states:

> (c)(1) Rules affecting home-equity plans—(i) Written notice required. For home-equity plans subject to the requirements of § 226.5b, whenever any term required to be disclosed under § 226.6(a) is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice shall be mailed or delivered at least 15 days prior to the effective date of the change. The 15-day timing requirement does not apply if the change has been agreed to by the consumer; the notice shall be given, however, before the effective date of the change.

---

[6] Compass attaches a copy of the United States *amicus* brief as exhibit 3.

12 C.F.R. § 226.9(c)(1). The Federal Reserve has not amended § 226.9(c)(1) since 2011, and the Federal Reserve has characterized the post-2008 amendments as "without intended substantive change" and only as "several technical and renumbering changes." Final Rule, 74 Fed. Reg. 5244-01, 5349 (Jan. 29, 2009); Interim Final Rule, 74 Fed. Reg. 36077-01, at 36083 (July 22, 2009).

Official Staff Commentary bolsters the *McCoy* interpretation of § 226.9(c)(1) (2008): "No notice of a change in terms need be given if the specific change is set forth initially, such as . . . a rate increase that occurs because the consumer has been under an agreement to maintain a certain balance in a savings account in order to keep a particular rate and the account balance falls below the specified minimum." Official Staff Commentary, cmt. 9(c)-1 (2008). In its *amicus* brief in *McCoy*, the United States analogized the imposition of a contractually specified default rate to the Official Staff Commentary example, concluding no notice was required. Br. for United States, at 12-13, *McCoy*, 562 U.S. 195. Like the regulation itself, the portion of the Official Staff Commentary the United States relied upon in *McCoy* is materially unchanged. It currently reads:

> *Changes initially disclosed.* No notice of a change in terms need be given if the specific change is set forth initially, such as: rate increases under a properly disclosed variable rate plan, . . . or an increase that occurs when the consumer has been under an agreement to maintain a certain balance in a savings account in order to keep a particular rate and the account balance falls below the specified minimum . . .

Official Staff Commentary, cmt. 9(c)(1)-1 (2018). The Andrades selectively quote portions of the Official Commentary for § 226.9(c)(1) relating to "timing" requirements for a change in terms notice but ignore the relevant portion in subparagraph 1 (above) that addresses whether notice is required in the first instance.

The Andrades cannot allege a violation of § 226.9(c) because the credit agreement disclosed up front Compass could increase the interest rate upon default. (Am. compl., Doc. 18-1, at 6.) Compass's imposition of default interest implemented a term set forth in the credit agreement—it was not a change in terms requiring notice. The Andrades further fail to state a claim for violation of § 226.9(c)(1) because, even if notice were required, they concede Compass provided notice of the increased minimum payment amount before the payment's effective date. (*See generally* am. compl., at 6- ¶¶ 35, 39, 49, 52.) The Andrades claim Compass "violated 12 C.F.R. § 226b(f)(3) by adversely changing the terms of the credit agreement after origination and without consent" similarly fails. (Am. compl., at 17 ¶ 103.) The 18% default interest was disclosed and authorized by the credit agreement. There was no change in terms.

## V. THE ANDRADES' REMAINING CLAIMS FAIL

### A. The Andrades' individual breach of contract claim fails on multiple grounds.[7]

*1. The Andrades' breach of contract claim fails because they admit default.*

The Andrades' admission that they first breached the credit agreement requires the court dismiss this claim. "It is a well established rule that a party to a contract who is himself in default cannot maintain a suit for its breach." *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990) (internal quotations omitted); *see also Williams v. Wells Fargo Bank, N.A.*, 560 Fed. App'x 233, 238 (5th Cir. 2014). The Andrades admit they did not make their December 2016 payment and did not timely make their January 2017 payment. (Am. compl., at 5-6 ¶¶ 29-32.) The loan statements establish the Andrades remained in default at all material times since December 2016

---

[7] The Andrades define the breach of contract class as only those "who were charged an increased 'default' annual percentage rate ("APR") to 18% or other default rate of interest prior to termination and acceleration of the credit line account." (Am. compl., at 12 ¶ 79.) The Andrades allege several other individualized breaches of the credit agreement, including whether Compass properly credited payments on the date received and whether Compass breached the agreement when it failed to return a payment. (*Id.*, at 11 ¶¶ 69, 72.) To the extent the Andrades intend to assert these as additional breach of contract claims, Compass treats them as outside their class claims given the individualized nature of them and because they fall outside the Andrades' breach of contract class definition.

and exceeded the credit limit beginning February 2017. (Ex. 1; *see supra* § II(B).) The Andrades' continual default precludes their individual and class breach of contract claims.

    2.    *Compass permissibly imposed default interest.*

Compass imposed default interest according to the contract. The Andrades allege Compass improperly charged default interest for the February, April, May, July, and August 2017 payments. (Am. compl., at 6-7, 9 ¶¶ 35, 39, 41, 52.) Default interest was proper for the February payment because the Andrades did not make a payment during the December or January billing cycles. (Exs. 1-2.) Compass properly assessed default interest for the April payment because the Andrades had not fully paid the February or March payments. (Exs. 1-2.) It properly charged default interest for the May payment because the Andrades had not fully paid the February-April payments. (Exs. 1-2.) Default interest was proper for the July and August payments because the Andrades did not make any payments after April 27. (Exs. 1-2.) The Andrades' claim for improper charging of default interest is at odds with the credit agreement and untenable.

    3.    *Compass did not breach the agreement by failing to return "an overpayment."*

Compass could not have refused to return an overpayment because the Andrades never made one. The Andrades contend Compass breached the credit agreement when it did not apply their $1,228.40 payment to the April-August payments. (Am. compl., at 8 ¶¶ 44-48, 72.) The loan statements reflect their $1,228.40 payment was insufficient to bring the loan current. (Ex. 1.) All payments allegedly made by the Andrades are accounted for in the statements, which show the Andrades' default and failure to pay sufficient funds to cure that default. (*Id.*) The Andrades did not tender any excess funds Compass could return or apply to future payments.

Even if the Andrades made an overpayment, the credit agreement refutes the Andrades' allegations Compass erred in refusing to apply the funds to the April-August payments. The

agreement states "Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments.  Instead, they will reduce the principal balance owed on the Credit Line."  (Doc. 18-1, at 5.)

    *4.    The Andrades allege no damages from an alleged delayed payment application.*

The Andrades' contention Compass breached the credit agreement when it waited two business days to apply the payment they made in January fails to state a claim.  The Andrades concede they did not make their December payment due on December 12.  (Am. compl., at 6 ¶ 30.)  When the Andrades made their January payment, they owed $593.02 for their December and January payments.  (EXS. 1-2.)  But, the Andrades did not pay the full amount due.  They ignored the statement and elected to pay $296.41 on January 11, 2017.  (Am. compl., at 6 ¶ 33; EX. 1.)  The $296.51 payment the Andrades made on January 11 was applied to their December, not January, payment.  (EXS. 1-2.)

The Andrades made their December payment 30 days after its due date.  (Am. compl., at 6 ¶¶ 30, 33; EXS. 1-2.)  The Andrades do not and cannot identify any damages they incurred because of the alleged delayed application of a payment 30 days late.  *Crose v. Humana Ins. Co.*, 823 F.3d 344, 347 (5th Cir. 2016) (damages are an element of a breach of contract claim).

    *5.    The Andrades' remaining breach of contract claims fail.*

The Andrades make other allegations in paragraphs 69 through 75 that could be construed as asserting additional breach of contract claims against Compass.  Out of an abundance of caution, Compass requests the court dismiss each one of them.

In paragraph 74, the Andrades allege Compass "demanded and charged additional fees that were not authorized by the contract."  (Am. compl., at 11 ¶ 74.)  But, the Andrades do not identify a single fee they contend Compass was not authorized to charge in their complaint.  (*See*

*generally id.*)  Nor do they identify which contractual provision Compass breached when it charged the unidentified fees.  *See Brooks-Perry v. Deutsche Bank Nat'l Tr. Co.*, No. 12-cv-665-LY, 2012 WL 12886437, at *7 (W.D. Tex. Oct. 22, 2012) (dismissing breach of contract claim based on allegations defendant charged unauthorized late fees when plaintiff did not "state which provisions of that contract were allegedly breached.")  The court must dismiss this claim (to the extent the Andrades plead it) because their allegations do not meet Rule 12's pleading standard.

The Andrades lastly allege Compass "refused to accurately communicate with Plaintiffs in good faith about the interest rate increase, improper payment application, and treatment of Plaintiffs' payments."  (Am. compl., at 12 ¶ 75.)  The Andrades once again do not identify a provision in the credit agreement where the parties agreed to communicate in good faith.  (*See generally id.*)  There isn't one.  (*See* doc. 18-1.)  Their claim fails for this reason alone.

To the extent the Andrades argue there is an implied duty of good faith, this fails because Texas only recognizes an implied contractual duty of good faith if there is a relationship between the parties marked by shared trust or an imbalance in bargaining power.  *Balch v. JPMorgan Chase Bank*, No. 3:14-cv-1412, 2015 WL 1592386, at *5-6 (N.D. Tex. April 8, 2015); *Motten v. Chase Home Fin.*, 831 F.Supp.2d 988, 1004 (S.D. Tex. 2011).  The relationship between a mortgagor and mortgagee does not create a duty of good faith as a matter of law.  *Id.*; *Eskew v. U.S. Bank Nat'l Ass'n*, No. A-14-cv-230, 2014 WL 12480000, at *3 (W.D. Tex. Sept. 19, 2014).

**B.     The economic loss rule defeats the Andrades' negligent misrepresentation claim.**

The economic loss rule bars a borrower's negligent misrepresentation claim when it focuses on a loan agreement.  "In Texas, the economic loss rule 'generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract.'"  *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 177-78 (5th Cir. 2016) (quoting *Lamar*

*Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007)).  A party can only bring a negligent misrepresentation claim basing on a contract if the plaintiff "can establish that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contact claim."  *290 at 71, L.L.C. v. JPMorgan Chase Bank*, No. A-09-CA-576-SS, 2009 WL 3784347, at *8 (W.D. Tex. Nov. 9, 2009) (citing *D.S.A. Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 664 (Tex. 1998)).  Texas courts routinely find the economic loss rule bars negligent misrepresentation claims arising from alleged servicing errors because the action sounds in contract alone.  *See e.g. Belay v. Countrywide Homeloans Inc.*, No. A-12-cv-050-LY, 2012 WL 12872462, at *10 (W.D. Tex. July 20, 2012) (economic loss rule barred negligent misrepresentation claim when the borrower alleged the mortgage servicer made misrepresentations concerning foreclosure); *Smith v. JPMorgan Chase Bank, N.A.*, 519 Fed. App'x 861, 862 (5th Cir. 2013) (economic loss rule barred negligent misrepresentation claim basing on same allegations supporting breach of contract claim, including whether the borrowers could obtain their own insurance under a loan agreement).

The Andrades' negligent misrepresentation claim cannot survive Rule 12(b)(6).  It is a reiteration of their unsupportable allegations Compass provided false information regarding the charging of default interest, increasing the Andrades' minimum payment, and treatment of their $1,228 April payment.  (Am. compl., at 23 ¶¶ 117-21.)  Additionally, the Andrades' negligent misrepresentation fails because they do not allege any damages outside the contract.[8]

**C.     The Andrades' RESPA claim fails.**

   1.     *12 U.S.C. § 2605(e) and 12 C.F.R. § 1024.35 do not apply to HELOCs.*

Compass had no obligation to acknowledge or respond to the Andrades' QWR because the error resolution procedures upon which the Andrades base their claims do not apply to HELOCs.

---

[8] It also fails because it bases on the misunderstanding Compass can only charge default interest after acceleration.

For purposes of 12 U.S.C. § 2605(e) and 12 C.F.R. § 1024.35, a home equity line of credit is not a mortgage loan within the ambit of the error resolution procedures.  *See* 12 C.F.R. § 1024.31.

The Andrades cite the wrong definitional section, 12 C.F.R. § 1024.2, to support their position the "loan is a 'federally related mortgage' under RESPA."  (Am. compl., at 24 ¶ 125.)  They ignore 12 C.F.R. § 1024.31, which states: "For purposes of this subpart [subpart C]. . . [m]ortgage loan means any federally related mortgage loan, as that term is defined in § 1024.2 . . . but does not include open-end lines of credit (home equity plans)."  The Andrades contend Compass violated 24 C.F.R. § 1024.35(d), which falls under subpart C.  Compass did not have an obligation to respond to the Andrades' QWR.  Accordingly, the Andrades' RESPA claim fails as a matter of law.

   2. *The Andrades have not alleged damages.*

The Andrades' RESPA claim also fails because they have not alleged permissible damages.  "To state a claim for a RESPA violation in connection with a QWR, a plaintiff must allege actual damages ***resulting from a violation of § 2605***."  *Steele v. Quantum Servicing Corp.*, No. 3:12-cv-2897, 2013 WL 3196544, at *6 (N.D. Tex. June 25, 2013) (internal quotations omitted).  The Andrades contend they were damaged because they "lost the time and postage it took to correspond with Compass and send their QWR for information on the loan."  (Am. compl., at 10 ¶ 65.)  These damages are insufficient to state a claim because "any such costs would have necessarily been incurred *before* the alleged RESPA violation."[9]  *Steele*, 2013 WL 3196544, at *8 (holding borrowers did not establish § 2605(e)(1)(A) damages basing on "costs incurred in preparing QWR and time lost in correcting alleged errors.").

---

[9] The Andrades request their attorney's fees and costs of suit for their RESPA claim.  (Am. compl., at 11 ¶ 66.)  To the extent they contend their attorney's fees and litigation expenses establish their RESPA damages, this argument fails.  *Whittier v. Ocwen Loan Servicing*, 594 Fed. App'x 833, 836-37 (5th Cir. 2014.) ("attorney's fees and expenses of litigation . . . cannot, as a matter of law, satisfy the actual damages requirement of a RESPA claim.")

The Andrades also contend they suffered damages because they did not know "whether [Compass] had received their QWR and whether [Compass] was planning to review the account and respond." (Am. compl., at 26 ¶ 134.)  These are not compensable damages.  *See Hernandez v. U.S. Bank, N.A.*, No. 3:13-cv-2164, 2013 WL 6840022, at *5 (N.D. Tex. Dec. 27, 2013) (RESPA does not define actual damages, but the term is "synonymous with 'compensatory damages.'")

Because the Andrades have not suffered actual damages, they cannot survive dismissal by alleging "[Compass]'s failure to comply with RESPA is a part of a pattern or practice of non-compliance."  *See Fraga v. U.S. Bank Nat'l Ass'n*, No. A-12-CA-128-SS, 2012 WL 13032891, at *3-4 (W.D. Tex. Sept. 21, 2012) (*See* am. compl., at 25 ¶ 133.)

## Conclusion

The Andrades' resentment over Compass charging default interest expressly permitted by a contract signed by the Andrades does not substantiate a lawsuit.  The Andrades concede they did not pay the higher monthly interest payments because they thought imposition of default interest was wrong.  The credit agreement establishes Compass can assess 18% interest upon a payment default without first terminating and accelerating the loan, precluding the Andrades' breach of contract claim.  Furthermore, the Andrades' argument underlying their TILA claim has been specifically rejected by the U.S. Supreme Court, which recently held that the imposition of default interest at a rate and upon conditions initially set forth in a credit agreement is not a change in terms requiring advance notice under 12 C.F.R. § 226.9(c)(1).

Each of the Andrades' remaining claims is similarly unsustainable. Negligent misrepresentation claims simply cannot survive a Rule 12 motion when they base on alleged mortgage servicing errors.  The Andrades' RESPA claim is based on a statutory provision that

**does not even apply** to the type of loan product they have with Compass, and, in any event, they fail to establish actual damages from Compass's failure to acknowledge or respond to the QWR. The court should dismiss the Andrades' claims with prejudice because any efforts by the Andrades to replead them would be futile. *See, e.g.*, *DeLoach v. Woodley*, 405 F.2d 496, 496-97 (5th Cir. 1968) (the Federal Rules of Civil Procedure "do not require that courts indulge in futile gestures.")

Date: March 9, 2018                                     Respectfully submitted,

*/s/ C. Charles Townsend*
C. Charles Townsend; SBN: 24028053
Lauren E. Hayes; SBN: 24081961
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: 214.720.4300
Facsimile:  214.981.9339
charles.townsend@akerman.com
lauren.hayes@akerman.com

Marc Gottlieb, *Admitted pro hac vice*
Florida Bar No. 987263
AKERMAN LLP
Las Olas Centre II
350 East Las Olas Blvd., Ste. 1600
Fort Lauderdale, FL 33301
Telephone: (954) 463-2700
Fax: (954) 463-2224
marc.gottlieb@akerman.com

**ATTORNEYS FOR COMPASS BANK D/B/A BBVA COMPASS**

## CERTIFICATE OF SERVICE

  I hereby certify that on March 8, 2018, a true and correct copy of the foregoing was served as follows:

**VIA ECF**
Philip A. Bock
Bock, Hatch, Lewis & Oppenheim, LLC
134 N. LaSalle St., Ste. 1000
Chicago, IL 60602

**VIA ECF**
Tod A. Lewis
Bock, Hatch, Lewis & Oppenheim, LLC
8308 Canola Bend
Austin, Texas 78729
*Counsel for the Andrades*

**VIA ECF**
Amy E. Clark
Amy Clark Law
11801 Domain Blvd., 3rd Floor
Austin, TX 78758
*Counsel for the Andrades*

            */s/ C. Charles Townsend*
            C. Charles Townsend